**CONCENTRIC NETWORK CORPORATION, (Now merged into and known as XO Communications, Inc.), Petitioner**

v.

**COMMONWEALTH of Pennsylvania, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 14, 2005.

Decided April 13, 2006.

Anthony Charles Gulotta, Jr., Harrisburg, for petitioner.

Karen M. Gard, Sr. Deputy Attorney General, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, and McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, and SIMPSON, Judge.

OPINION BY Judge SIMPSON.

This appeal involves sales and use tax on purchases by an Internet service provider of equipment and of access to wirelines. In particular, Concentric Network Corporation (now merged into and known as XO Communications, Inc.) (Taxpayer) filed exceptions to this Court's previous determination which essentially denied Taxpayer a substantial refund of sales and use taxes paid in 1999 and 2000.[1]

We need not repeat at length the extensive and technical facts to which the parties stipulate. These facts were adequately recounted in our earlier decision. *Concentric Network Corp. v. Commonwealth*, 877 A.2d 542 (Pa.Cmwlth.2005).

It is sufficient for present purposes to note how Taxpayer used the equipment and the wireline access.

Regarding the equipment at issue, Taxpayer purchased routers and associated equipment to direct or "route" its customers' data to its intended destination and to analyze incoming data for efficient delivery. Taxpayer used its servers for a variety of functions, including authentication of user status, e-mail, web caching, and web hosting. Further, Taxpayer's modems converted certain customers' analog data to digital signals. Stipulations of Fact Nos. 23, 24, 25.

As to the wireline access, Taxpayer does not own its own wirelines. Instead, Taxpayer purchased services from large telecommunications carriers such as MCI Worldcomm, Verizon and AT & T. The services provided Taxpayer with access to the telecommunication carriers' wirelines so that it could "transport its Customers' data traffic to and from the [Taxpayer's] serving office and to and from the Internet backbone." Stipulations of Fact No. 26. Taxpayer used the telecommunications carriers' wirelines rather than other technologies (such as television cable lines) to connect its customers to the Internet.

Taxpayer's refund request was denied first by the Department of Revenue Board of Appeals, and then by the Board of Finance and Revenue. On subsequent petition for review, the refund request was denied by a panel of this Court conducting *de novo* review.[2] Exceptions to that deci-

---

1. The parties stipulated that if Taxpayer is entitled to a sales and use tax refund on purchases of "data transport services," the amount should be $85,255.55. In addition, if Taxpayer is entitled to a tax refund for "purchases of equipment used in the process of providing internet access," the amount should be $63,989.25. Stipulation of Facts No. 32.

2. Although this Court hears appeals from the Board of Finance and Revenue in our appellate jurisdiction, this Court functions essentially as a trial court. *Bell Atl. Mobile Sys., Inc. v. Commonwealth*, 799 A.2d 902 (Pa. Cmwlth.2002), *aff'd per curiam*, 577 Pa. 328, 845 A.2d 762 (2004). A stipulation of facts is binding and conclusive upon the Court, but

sion are currently before the Court *en banc,* consistent with Pa. R.A.P. 1571(i).

## I. Statutory Background

The Tax Reform Code of 1971 (Tax Code)[3] governs the sales and use tax issues here. Section 202 of the Tax Code, 72 P.S. § 7202, imposes upon each sale at retail of tangible personal property or services a tax on a percentage of the purchase price to be collected from the purchaser. The Tax Code defines the term "tangible personal property"[4] as corporeal personal property including interstate telecommunications service.

The Tax Code defines certain occurrences as outside the definition of a taxable "sale at retail." Thus, the transfer of property to be used or consumed in the manufacture of tangible personal property does not qualify as a sale at retail, and therefore it is not subject to tax.[5] Similarly, "sale at retail" does not include the

transfer of tangible personal property for resale.[6] Therefore, these occurrences are not subject to tax. Also, the delivering or rendering of a public utility service and the construction, repair and maintenance of facilities for a public utility service do not qualify as a taxable "sale at retail."[7]

Federal regulation of Internet service providers is also relevant, if not controlling. The Communications Act of 1934,[8] was amended by the Telecommunications Act of 1996[9] (Communications Act). The Communications Act regulates telecommunications carriers but not information service providers. *Nat'l Cable and Telecomms. Ass'n v. Brand X Internet Servs.,* —— U.S. ——, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). This scheme codifies an historical regulatory distinction between "basic" service and "enhanced" service. In other words, telecommunications service is the equivalent of "basic" service, which

we may draw our own legal conclusions from those facts. *Id.*

3. Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. §§ 7101–10004.

4. Section 201(m) of the Tax Code, 72 P.S. § 7201(m), defines "**Tangible personal property**" as:

   Corporeal personal property including, but not limited to, goods, wares, merchandise, steam and natural and manufactured and bottled gas for non-residential use, electricity for non-residential use, prepaid telecommunications, premium cable or premium video programming service, spirituous or vinous liquor and malt or brewed beverages and soft drinks, interstate telecommunications service originating or terminating in the Commonwealth and charged to a service address in this Commonwealth, intrastate telecommunications service with the exception of (i) subscriber line charges and basic local telephone service for residential use and (ii) charges for telephone calls paid for by inserting money into a telephone accepting direct deposits of money to operate, provided further, the service address of any intrastate telecommunications service

is deemed to be within this Commonwealth or within a political subdivision, regardless of how or where billed or paid. In the case of any such interstate or intrastate telecommunications service, any charge paid through a credit or payment mechanism which does not relate to a service address, such as a bank, travel, credit or debit card, but not including prepaid telecommunications, is deemed attributable to the address of origination of the telecommunications service.

5. Sections 201(k)(8)(A) and (*o*)(4)(B)(i) of the Tax Code, 72 P.S. §§ 7201(k)(8)(A), 7201(*o*)(4)(B)(i).

6. Section 201(k)(8) of the Tax Code, 72 P.S. § 7201(k)(8).

7. Section 201(k)(8)(C) of the Tax Code, 72 P.S. § 7201(k)(8)(C).

8. 47 U.S.C. §§ 151–614.

9. Pub. Law No. 104–104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.).

consists largely of plain old telephone service, and it is more extensively regulated. *Id.; California v. F.C.C.*, 905 F.2d 1217 (9th Cir.1990). In contrast, "information service" is the equivalent of "enhanced" service, which combines basic service with a capability to generate, acquire, transform, store, transform, process or make available information via telecommunications. *Nat'l Cable.* "Non-facilities based" Internet service providers—those like Taxpayer here that do not own the transmission facilities they use to connect the end-user to the Internet—are classified solely as information service providers. *Id.*

In 1998, Congress enacted the Internet Tax Freedom Act.[10] This temporary moratorium on taxes on Internet access began on October 1, 1998 and was in effect at the time involved in this case. The Internet Tax Freedom Act also prohibited discriminatory taxes on electronic commerce, including a state tax that "establishes a classification of Internet access service providers ... for purposes of establishing a higher tax rate to be imposed on such providers than the tax rate generally applied to providers of similar information services delivered through other means."[11]

## II. Equipment

Taxpayer raises three arguments to support its claim that its purchases of equipment should not be taxed. First, Taxpayer claims the purchases are not taxable because the equipment is used in manufacturing. Second, Taxpayer contends application of the tax to its purchases of equipment violates the Uniformity Clause of the Pennsylvania Constitution,[12] because such purchases by cable companies and facilities based Internet service providers are not taxed. Third, Taxpayer argues the purchased equipment is used to provide public utility service, and it is therefore not within the definition of a taxable "sale at retail." None of these contentions is meritorious.

## Manufacturing

In our earlier decision, we decided that the operations performed by the equipment did not fall within the Tax Code's definition of manufacturing.[13] We relied on the recent holding in *Bell Atlantic Mobile Systems, Inc. v. Commonwealth*, 799 A.2d 902 (Pa.Cmwlth.2002), *aff'd per curiam*, 577 Pa. 328, 845 A.2d 762 (2004) (taxpayer that provided cellular telecommunications service was not entitled to manufacturing exemption from sales and use tax). Having reexamined our determination, we discern no error.

■ Taxpayer raises a new argument based on a 2003 amendment to the Tax

---

10. Pub. Law No. 105–277, Div. C, Title XI, §§ 1100 to 1104, 112 Stat. 2681–719 (1998) (current version at 47 U.S.C. § 151 note).

11. Section 1104(2)(A)(iv) of the Internet Tax Freedom Act, Pub. Law No. 105–277, Div. C, Title XI, § 1104(2)(A)(iv), 112 Stat. 2681–719 (1998) (current version at 47 U.S.C. § 151 note).

12. The Uniformity Clause of the Pennsylvania Constitution, Article VIII, Section 1 provides, "[a]ll taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be

levied and collected under general laws." PA. CONST. art. VIII, § 1.

13. Section 201(c) of the Tax Act, 72 P.S. § 7201(c), defines "**Manufacture**" in pertinent part as:

The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any tangible personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer....

Code.[14] Taxpayer contends this amendment essentially overrules *Bell Atlantic* because it adds mobile telecommunications service to the Tax Code's definition of "processing" activities that do not qualify as a taxable "sale at retail." This addition to the "processing" definition, Taxpayer contends, changes a crucial underpinning of *Bell Atlantic*.

We reject this argument for two reasons. First, the amendment to the Tax Code occurred several years after the taxable periods in question. There is no reason to believe the amendment was intended to receive retroactive effect. Second, *Bell Atlantic* was based on several rationales, not all of which are implicated by the subsequent statutory amendment. For these reasons, Taxpayer is not entitled to relief on this theory.

### Uniformity of Taxation

In our earlier decision, we held that application of the sales and use tax to Taxpayer did not offend the constitutional requirement for uniform taxation even though cable operators and facilities-based telecommunications carriers received exemptions as public utilities. There is no error in this conclusion.

■■■ To be uniform, a tax must operate alike on the classes of things or property subject to it. *Devlin v. City of Philadelphia*, 580 Pa. 564, 862 A.2d 1234 (2004). The legislature has wide discretion in matters of taxation, and a taxpayer pursuing a Uniformity Clause challenge has the burden of demonstrating that a classification made for purposes of taxation is unreasonable and "clearly, palpably and plainly violates the Constitution." *Id.* at 588, 862 A.2d at 1249 (quoting *Leonard v. Thornburgh*, 507 Pa. 317, 321, 489 A.2d 1349,

1351–52 (1985)). If there is "some legitimate distinction between the classes that provides a non-arbitrary and 'reasonable and just' basis for the difference in treatment," the tax legislation is to be upheld. *Id.* at 588–89, 862 A.2d 1234, 862 A.2d at 1249 (quoting *Leonard*, 507 Pa. at 321, 489 A.2d at 1352). On the other hand, when there exists no legitimate distinction between the classes, and, thus, the tax schemes impose substantially unequal burdens upon persons otherwise similarly situated, the tax is unconstitutional. *Id.* The analysis under the Uniformity Clause is "generally the same as that under the equal protection clause of the United States Constitution." *Id.* at 589, 862 A.2d at 1249 (quoting *Wilson Partners, L.P. v. Bd. of Fin. & Revenue*, 558 Pa. 462, 471, 737 A.2d 1215, 1220 n. 11 (1999) (citing *Leonard*, 507 Pa. at 320, 489 A.2d at 1351)).

The United States Supreme Court recently faced a similar argument in *National Cable*. Among other things, the Court addressed historically different regulatory treatment by the Federal Communications Commission (FCC) of Internet service provided by operators that utilize television cable lines and of similar service provided by operators that utilize telephone wirelines. *Nat'l Cable*, 125 S.Ct. at 2710–11. The Court concluded that different regulatory treatment was justified based on the history of regulation and policy considerations, which were described in detail in its opinion.

■■■ We adopt similar reasoning here. No violation of the Uniformity Clause is evident where applications of tax follow different regulatory treatment. Because non-facilities based Internet service pro-

---

14. Act of December 23, 2003, P.L. 250, effective immediately, added Section 201(d)(17), 72 P.S. § 7201(d)(17).

viders, like Taxpayer, are regulated to a different degree than facilities based providers and cable based providers, different tax treatment is permissible.

Also, non-facilities based Internet service providers, like Taxpayer, do not own the lines they use. In contrast, facilities based Internet service providers own the transmission facilities they use. A different tax result which reflects a different level of investment in infrastructure can be justified.

## Public Utility Service

Taxpayer renews its brief argument that it provides public utility service and therefore its purchases of equipment do not qualify as taxable sales at retail.

■ This Court correctly rejected this argument in its earlier opinion, based on *Bell Atlantic*. Like the disappointed taxpayer in *Bell Atlantic*, Taxpayer here does not meet the definition "public utility" in the Public Utility Code.[15] Moreover, Taxpayer "is not regulated as a public utility by the Pennsylvania Public Utility Commission in its capacity as an Internet Service Provider selling Internet access to customers." Stipulations of Facts No. 5.[16]

The Internet functionality of its equipment is the basis for Taxpayer's refund claim. However, Taxpayer is not a public utility with regards to its provision of Internet services. Accordingly, Taxpayer cannot claim a refund under the theory that it provides public utility Internet services.

For all the foregoing reasons, we deny and dismiss exceptions relating to purchases of equipment.

## III. Wireline Access

As to its purchase of wireline access, which the Stipulations of Fact refer to as "data transport services," Taxpayer raises numerous arguments. In addition to the previously discussed contentions involving manufacturing, uniformity of taxation and public utility service, Taxpayer claims a refund from tax paid on purchase of wireline access on three theories. Its primary theory is that data transport services do not qualify as "telecommunications services" under the Tax Code. Also, Taxpayer contends that because it resells its data transport services, such a transaction is not subject to the tax. Finally, Taxpayer claims protection under the Internet Tax Freedom Act.

We need not repeat our discussion of contentions involving manufacturing, uniformity of taxation and public utility service. Rather, we concentrate on those arguments peculiar to wireline access purchases.

## Telecommunications Services

Taxpayer raises two aspects to its contention that purchase of access to wirelines does not qualify as taxable purchase of telecommunications services.[17] First, it

---

15. Section 102 of the Public Utility Code, 66 Pa.C.S. § 102, defines "public utility." Meeting this definition is one of the requirements for those seeking the public utility exemption from sales and use tax. *Bell Atl.*

16. Taxpayer holds a Certificate of Public Convenience and is regulated as a public utility only in its capacity as a telecommunications service provider rendering telecommunications services. Stipulations of Fact No. 5. Paradoxically, Taxpayer claims that its purchases do not qualify as taxable "telecommunications services" under the Tax Code. This contention is more fully examined hereafter.

17. Section 201(rr) of the Tax Code, 72 P.S. § 7201(rr), defines **"Telecommunications service"** in pertinent part as (with emphasis added):

Any one-way *transmission* or any two-way, interactive transmission of sounds, signals, or other intelligence converted to like form,

asserts it merely purchased connectivity to a network and did not purchase "transmission." Because "transmission" is an essential element of defined telecommunications services, its purchases are not taxable. Second, its purchases are actually bulk purchases of Internet access from larger, national Internet service providers. Because Internet access is excluded from the definition of "telecommunications services," these purchases are not taxable.

■ With reference to the "lack of transmission" argument, we reject Taxpayer's narrow interpretation of the statutory definition. Taxpayer purchased use of transmission facilities. *See Nat'l Cable*, 125 S.Ct. at 2706–07. These facilities can be understood as the physical transmission pathway over which the data travels. *Id.* at 2715 (Scalia, J., dissenting). Use of the physical transmission pathway provided by a telecommunications carrier satisfies the Tax Code's definition of telecommunication services.

We also decline Taxpayer's invitation to view purchase of wireline access as a non-taxable bulk purchase of Internet access. Under the Tax Code, access to the Internet does *not* include "[t]elecommunications services purchased by an Internet service provider to deliver access to the Internet to its customers." 72 P.S. § 7201(rr)(3)(B). This specific provision controls. It commands the conclusion that big or small, Taxpayer's purchase of wire-line access to transport its customers' data to and from the Internet is taxable.

## Resale

Taxpayer advances the related contention that it purchased bulk access to data networks which it did not consume but which it resold to its customers on a retail basis. Because such a bulk purchase was intended for resale, the purchase fell outside the definition of a taxable "sale at retail." On exceptions, Taxpayer highlights that part of a Department of Revenue regulation describing non-taxable transfers for the purpose of resale as including a transfer of property which is "to be sold, rented or leased in the regular course of business...."[18]

■ In *National Cable*, the United States Supreme Court discussed the functional integration of products offered by Internet service providers. In particular, viewed from the perspective of the retail customer, wireline access merges with enhanced computing function to appear as a single useful service without discrete parts. The Court concluded this viewpoint supported the FCC's approach to the challenged regulatory treatment.

This analysis is useful here. Taxpayer did not resell raw, unadorned wireline access to its customers. Rather, it sold a functionally integrated package which included both use of a physical transmission

---

which effects or is intended to effect meaningful communications by electronic or electromagnetic means via wire, cable, satellite, light waves, microwaves, radio waves, or other transmission media. The terms include all types of telecommunication transmissions, such as local, toll, wide-area or any other type of telephone service.... The term does not include any of the following:
(3) Charges for access to the Internet. *Access to the Internet does not include any of the following:*

...
(B) *Telecommunication services purchased by an Internet service provider to deliver access to the Internet to its customers.*
This definition was part of an amendment to the Tax Code embodied in the Act of April 23, 1998, P.L. 239, effective July 1, 1998. The significance of the timing of this amendment is discussed below.

**18.** 61 Pa.Code § 32.3(a)(1)(i).

pathway and intangible computing functions including e-mail, web caching and web hosting. From the retail customer's viewpoint, neither part is appreciated without the other.

Pennsylvania courts interpreting the resale exemption hold that items transferred with a service or product are not resold to a customer. *See Am. Airlines, Inc. v. Bd. of Fin. & Revenue*, 542 Pa. 1, 665 A.2d 417 (1995) (cost of food and beverages part of price of airline ticket and part of service of transportation; food and beverage not resold to passengers); *Aldine Apartments, Inc. v. Commonwealth*, 493 Pa. 480, ·426 A.2d 1118 (1981) (tenants provided with complete rental unit; landlord did not resell utilities to tenants). Under this reasoning, Taxpayer is not· entitled to relief under the resale theory. Interestingly, this is the same result reached by the New York Division of Tax Appeals in response to .Taxpayer's claim for refund of that state's sales and use tax based on the resale theory. *In the Matter of the Petition of Concentric Network Corp.*, 2005 WL 221594, DTA No. 819533 (N.Y.Div. Tax.App., January 20, 2005) (Concentric did not make purchases for resale and is not in the business of selling telephone or telegraph services).

For these reasons, we deny exceptions based on the resale theory.

### Internet Tax Freedom Act

Taxpayer also contends the Internet Tax Freedom Act's moratorium on taxing Internet access and on discriminatory taxes on electronic commerce trumps the Tax Code and compels relief.[19] Taxpayer asserts the wireline access it purchased is in essence Internet access protected by that Federal statute. Further, Taxpayer asserts application of the Tax Code gives a preference to cable based and facilities based Internet service providers to the detriment of non-facilities based Internet service providers. Taxpayer claims such a preference constitutes prohibited discriminatory taxation. These arguments lack merit.

19. Section 1101(a) of the Internet Tax Freedom Act prohibits states and political subdivisions from imposing any of the following taxes during the period of October 1, 1998 and ending on November 30, 2003:

(1) taxes on Internet Access, unless such tax was generally imposed and actually enforced prior to October 1, 1998; and
(2) multiple of discriminatory taxes on electronic commerce.
Pub. Law No. 105–277, Div. C, Title XI, § 1101(a)(1), (2), 112 Stat. 2681–719 (1998) (current version at 47 U.S.C. § 151 note).
In Section 1104(2), the Internet Tax Freedom Act· goes on to define "discriminatory taxes" as
(A) any tax imposed by a State or political subdivision thereof on electronic commerce that—
(i) is not generally imposed and legally collectible by such State or such political subdivision on transactions involving similar property, goods, services or information accomplished through other means;
(ii) is not generally imposed and legally collectable at the same rate by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means, unless the rate is lower as a part of the phase-out of the tax over not more that a 5–year period;
(iii) imposes an obligation to collect or pay the tax on a different person or entity that in the case of transactions involving similar property, goods, services, or information accomplished through other means; and
(iv) *establishes a classification of Internet access service providers or online service for providers for purposes of establishing a higher tax rate on such providers than the tax rate generally applied to providers of similar information services delivered through other means.*
Pub. Law No. 105–277, Div. C, Title XI, § 1104(2)(A)(i)-(iv), 112 Stat. 2681–719 (1998) (current version at 47 U.S.C. § 151 note) (emphasis added).

■ The Internet Tax Freedom Act does not apply to taxes on Internet access "generally imposed and actually enforced prior to October 1, 1998...."[20] We need not decide whether application of the Tax Code to Taxpayer's purchases is a tax on Internet access, because we conclude that Tax Code provisions in question were generally imposed and actually enforced prior to October 1, 1998.

In 1997, the Department of Revenue published its Statements of Policy that telecommunications services were taxable under the sales and use tax. 61 Pa.Code § 60.20, adopted October 17, 1997, effective October 18, 1997, 27 Pa. Bull. 5432, *as amended*, December 19, 1997, effective December 20, 1997, 27 Pa. Bull. 6577. In confirmation of the Department's published policy, the General Assembly passed an amendment to the Tax Code on April 23, 1998, effective July 1, 1998, which added telecommunication services to the definition of tangible personal property. Act of April 23, 1998, P.L. 239. Accordingly, the Internet Tax Freedom Act's prohibition on taxing Internet access does not apply to Pennsylvania's preexisting sales and use tax scheme.[21]

■ Also, the Internet Tax Freedom Act's prohibition of discriminatory tax on electronic commerce does not support a refund. That statute prohibited discriminatory taxes, including a state tax that "establishes a classification of Internet ac-cess service providers ... for purposes of establishing a higher tax rate to be imposed on such providers than the tax rate generally applied to providers of similar information services delivered through other means."[22] However, the Tax Code does not classify information service providers, nor does it establish different tax rates on information service providers, as proscribed by the Internet Tax Freedom Act.

Moreover, Taxpayer pays sales and use tax because it uses other companies' wirelines to provide its services. Taxpayer is not prohibited by the Tax Code from installing its own wirelines or from using some other technology to provide its services. If it chooses an alternate solution, it will not pay sales and use tax on purchases of telecommunications services. In short, the tax at issue here results not from a discriminatory tax on electronic commerce but from Taxpayer's business decisions.

## IV. Summary

Given the foregoing discussion, we deny and dismiss Taxpayer's exceptions. Pursuant to the Stipulations of Fact, Taxpayer is entitled to receive a refund of $7,242.37 of sales and use taxes paid in 1999 and 2000. All other claims for refund are denied.

President Judge COLINS dissents.

20. Section 1101(a)(1) of the Internet Tax Freedom Act of 1998, Pub. Law No. 105–277, Div. C, Title XI, § 1101(a)(1), 112 Stat. 2681–719 (1998) (current version at 47 U.S.C. § 151 note).

21. The moratorium of the Internet Tax Freedom Act was extended in 2004 by the Internet Tax Nondiscrimination Act. Pub. Law No. 108–435, 118 Stat. 2615 (2004) (codified as amended at 47 U.S.C. § 151 note). However, Section 1104 continues to "grandfather" those state laws that tax Internet access if, as here, before October 1, 1998:(1) the tax was authorized by statute; and (2) an Internet service provider had reasonable opportunity to know by rule or public proclamation of the tax agency's interpretation.

22. Section 1104(2)(A)(iv) of the Internet Tax Freedom Act, Pub. Law No. 105–277, Div. C, Title XI, § 1104(2)(A)(iv), 112 Stat. 2681–719 (1998) (current version at 47 U.S.C. § 151 note).

## ORDER

**AND NOW,** this 13th day of April, 2006, exceptions of Concentric Network Corporation (now merged into and known as XO Communications, Inc.) are **DENIED and DISMISSED.** Accordingly, judgment is entered in favor of Concentric Network Corporation in the amount of $7,242.37, plus interest.